# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

**RITA M. NASH**                                                                              **PLAINTIFF**

**V.**                                           **CIVIL ACTION NO. 3:11CV731 CWR-LRA**

**MICHAEL J. ASTRUE**
**COMMISSIONER OF SOCIAL SECURITY**                            **DEFENDANT**

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Rita Nash appeals the final decision denying her application for a period of disability and disability insurance benefits. The Commissioner opposes the motion and requests an order pursuant to 42 U.S.C. § 405(g), affirming the final decision of the Administrative Law Judge. Having carefully considered the hearing transcript, the medical records in evidence, and all the applicable law, the undersigned recommends that the decision be affirmed.

## Factual and Procedural Background

On June 10, 2008, Nash protectively filed an application for a period of disability and disability insurance benefits alleging that she became disabled on February 23, 1995. The applications were denied initially and on reconsideration. She appealed the denial and on July 28, 2010, Administrative Law Judge Charles C. Pearce ("ALJ") rendered an unfavorable decision finding that Plaintiff had not established a disability within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review on September 26, 2011. She now appeals that decision.

Nash is a high school graduate with two years of college education. She was approximately 44 years old at her administrative hearing. She has past relevant work experience as an assembly line worker at Delphi Automotive in Brookhaven, Mississippi, and as a jailer at the Pike County Sheriff's Department. She is 4 feet, 11 inches tall and weighed 232 pounds at her administrative hearing. She alleges disability due to carpal tunnel syndrome, and pain in her back, neck, leg and shoulder.

After reviewing the evidence, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. At step one of the five-step sequential evaluation,[1] the ALJ found that Plaintiff had engaged in substantial gainful activity since her alleged onset date – February 23, 1995, and he denied her claim from that date through October 1, 2006.[2] He also found that her work after October 1, 2006, did not rise to the level of substantial gainful activity. At steps two and three, the ALJ found Plaintiff's obesity was a severe impairment, but none of her impairments met or medically equaled any listing. At step four, the ALJ found that Plaintiff could perform the full range of light work. The ALJ

---

[1] Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Sub-part P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is there any work in the national economy that plaintiff can perform? *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

[2] Plaintiff does not challenge the ALJ's finding that she engaged in substantial gainful activity between February 23, 1995, and October 1, 2006.

2

concluded at step five, that given Plaintiff's age, education, work experience, and residual functional capacity, she could return to her past relevant work as a jailer.

**Standard of Review**

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

**Discussion**

Nash raises two primary arguments on appeal: (1) the ALJ erred in failing to find that her carpal tunnel syndrome and osteoarthritis were severe impairments at step two; and, (2) the ALJ erred in finding that she has the residual functional capacity to perform the full range of light work. The Court rejects these arguments for the reasons that follow.

3

**1. Substantial evidence supports the ALJ's non-severity determination.**

Nash argues that her carpal tunnel syndrome and osteoarthritis of the right knee "cause at least a limited ability to perform gainful activity," and the ALJ's failure to find them severe at step two was reversible error. The record reflects that in evaluating the severity of Plaintiff's impairments, the ALJ expressly relied on *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985)*,* in compliance with controlling Fifth Circuit law. *Stone* holds that an impairment is not severe "'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Id*. at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir.1984)).[3] Based on the examination of the record as a whole, the ALJ concluded that Plaintiff's obesity was her only severe impairment.

Plaintiff asserts, however, that the ALJ erroneously rejected evidence establishing the severity of her carpal tunnel syndrome without explanation. This argument is without merit. In assessing the medical evidence, the ALJ noted that a nerve conduction study performed by Dr. Larry Farina in October 2003 revealed "moderate to severe bilateral carpal tunnel syndrome, demyelinating; borderline to mild ulnar sensory neuropathy."

---

[3] *See also Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010) (citing *Stone*, 752 F.2d at 1101) (unpublished )("An impairment is severe if it significantly limits an individual's physical or mental abilities to do basic work activities; it is not severe if it is a slight abnormality . . . that has no more than a minimal effect on the claimant's ability to do basic work activities.").

4

Plaintiff's "electromyography (EMG) and nerve conduction velocity (NCV) tests were within normal limits." But as noted by the ALJ, records indicate that Plaintiff continued to work for three years at Delphi Automotive before undergoing a right carpal tunnel release in September 2006.[4] She was reportedly doing well post-surgery, and although she indicated that she could not return to Delphi, Dr. Larry Field released her to "light duty" in October 2006. In September 2008, Plaintiff underwent a consultative examination with Dr. Andrew Yates, who noted her history of bilateral carpal tunnel syndrome, and treatment for a rotator cuff tear, status post-fracture of the left arm, and a cervical spine fusion. Plaintiff advised Dr. Yates that while her carpal tunnel surgery had provided some relief, she believed the symptoms had started to return. She reported that she could write, button, and brush her teeth and hair, but had difficulty lifting pots and pans. His objective examination findings indicated that Plaintiff had 4/5 grip strength bilaterally and full range of motion in her upper extremities and shoulder. These findings are corroborated by a physical capacities evaluation completed by her treating nurse practitioner in February 2010. The practitioner notes, in relevant part, that Plaintiff can frequently engage in gross and fine manipulations. No lifting or carrying limitations are otherwise identified.[5]

---

[4]The ALJ indicated that Plaintiff had carpal tunnel surgery in 2004, but the record reflects that she underwent a cervical fusion in December 2004, and had the carpal tunnel release in September 2006. ECF Nos. 13-2, p. 16. 13-7, pp. 7 -12.

[5]ECF No. 13-7, pp. 2-6, 53-54, 61-63, 127-28.

Given the facts as stated, there is substantial evidence to support the ALJ's finding that Plaintiff's carpal tunnel syndrome was not a severe impairment as contemplated by *Stone*.[6]

The ALJ's findings concerning Plaintiff's osteoarthritis of the right knee are less clear. Although he references her right leg pain in his analysis at step two, he does not expressly identify "osteoarthritis" as a medically determinable impairment or make any express findings as to its severity, or lack thereof. In summarizing the medical evidence, he notes that Plaintiff had a MRI of the lower right extremity which showed only ***mild*** medial joint space osteoarthritis, and that the meniscus, lateral meniscus, and lateral joint space were all normal. He also notes that Plaintiff's treating orthopedist found her hip and knee examinations were unremarkable and opined that her back and leg pain were easily explained by her weight and small frame. Given this medical finding, it was reasonable for the ALJ to conclude that Plaintiff's leg pain was caused by her obesity

---

[6]Further, as the Commissioner argues, any error in finding that Plaintiff's carpal tunnel syndrome was not a severe impairment was harmless. Plaintiff continued to work as an assembly line worker at Delphi Automotive for three years after she was diagnosed with carpal tunnel syndrome. The ALJ also found that she could perform her past relevant work as a jailer which, unlike her work at Delphi, requires only occasional fingering and frequent handling. *See* U.S. Dep't. of Labor, Dictionary of Occupational Titles (4th ed. 1991) § 372.367-014, 1991 WL 673090. As jailer, Plaintiff indicated that she "processed inmates in to the computer system, made sure they went to court, had bonds set, made sure they got their meds . . ., [and] answered phones." ECF No. 13-6, p. 26.

6

which he deemed to be severe at step two.[7]

At any rate, Plaintiff cannot show that she was prejudiced by the ALJ's failure to find her osteoarthritis was a severe impairment. *Carey v. Apfel*, 230 F.3d. 131, 142 (5th Cir. 2000). The failure to make a severity finding at step two alone is not grounds for automatic reversal or remand. *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)(failure to make a severity finding at step two not a basis for remand where ALJ proceeded to later steps of the analysis). "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, **without consideration of the remaining steps in the sequential analysis**, claims of those whose impairment is more than a slight abnormality." *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (quoting *Anthony*, 954 F.2d at 294)(emphasis added). Plaintiff's claims were not summarily dismissed at step two here. After finding that Plaintiff's obesity was severe at step two, the ALJ found that Plaintiff had the residual functional capacity to return to her past relevant work as a jailer. In making this finding, the ALJ considered all of Plaintiff's medically determinable impairments and their limiting effects. *Graves v. Astrue*, 2:07 CV306 KS-MTP, 2008 WL 4093726 (S.D. Miss. Aug. 27, 2008) (citing 20 C.F.R. §§404.1523 & 416.923). He specifically found that Plaintiff's obesity was a key source of her vocational limitation, and that its combined effect with her other impairments limited her to light work. He stated in relevant part as follows:

---

[7]ECF No. 13-2, pp. 16-19; 13-7, p. 123.

7

> . . . .Obesity can cause limitation of function. The functions likely to be
> limited depend on many factors, including where the excess weight is
> carried. An individual may have limitations in any of the exertional
> functions such as sitting, standing, walking, lifting, carrying, pushing, and
> pulling. It may also affect ability to do postural functions, such as climbing,
> balance, stooping, and crouching. . . . . The combined effects of obesity
> with other impairments may be greater than might be expected without
> obesity. For example, someone with obesity and arthritis affecting a
> weight-bearing joint may have more pain and limitation than might be
> expected from the arthritis alone. The ability to manipulate may be affected
> by the presence of adipose (fatty) tissue in the hands and fingers. . . . I have
> considered the claimant's obesity in her residual functional capacity. I find
> that the claimant remains capable of lifting ten pounds frequently and
> twenty pounds occasionally, standing and walking six hours in an eight-
> hour workday, and sitting, pushing and pulling as required by light work.[8]

Thus, this case did not turn on the ALJ's finding that Plaintiff's osteoarthritis and carpal tunnel syndrome were not severe, but on whether Plaintiff had the residual functional capacity to perform her past relevant work – "an inquiry unaffected by the test set forth in *Stone*." *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987).

### 2. Substantial evidence supports the ALJ's residual functional capacity assessment that Plaintiff can perform light work.

Plaintiff asserts in her next assignment of error that the ALJ's residual functional capacity assessment is not supported by substantial evidence because he failed to comply with Social Security Rulings 96-2p and 96-8p. As to SSR 96-2p, she argues that the ALJ failed to assign controlling weight to the consultative examination performed by Dr. Yates; the nerve conduction study performed by Dr. Farina; and, the medical source

---

[8]ECF No. 13-2, p. 19. Social Security regulations provide that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.... [Light work] requires a good deal of walking or standing, or ... sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b) (2013).

8

statement completed by her nurse practitioner. At the outset, the Court notes that SSR 96-2p applies to the evaluation of treating source opinions. *See* SSR 96–2p, 1996 WL 374188. Dr. Yates was a consultive examiner, not Plaintiff's treating physician, and his findings support the ALJ's residual functional capacity assessment. The ALJ also expressly discussed the results of Dr. Farina's nerve conduction study in finding that her carpal tunnel syndrome was not a severe impairment at step two. Dr. Farina did not submit a medical source statement assigning any functional limitations as a result of his testing. The Court further notes that the overall evidence of record reflects the ALJ had good cause to assign reduced weight to the nurse practitioner's medical source statement, as set forth below.

As to SSR 96-8p, Plaintiff maintains that the ALJ failed to conduct a function-by-function assessment of her limitations by addressing the strength demands of light work. SSR 96-8p requires an ALJ when assessing residual functional capacity to perform a function-by-function analysis of the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. 1996 WL 374184, at *1, 3. While the record in this case reflects the ALJ did not conduct an exhaustive function-by-function analysis of SSR 96-8p, substantial evidence supports his finding that Plaintiff has the residual functional capacity for light work. *Porter v. Barnhart*, 200 F. App'x. 317 (5th Cir. 2006) (unpublished) (finding compliance with SSR 96-8p when the ALJ considers the record as a whole); *Conerly v. Barnhart*, No.

9

1:05CV467- LG-JMR, 2008 WL 724030 (S.D. Miss. Mar. 17, 2008).

Plaintiff testified at her administrative hearing that she is unable to work because of constant and unremitting pain in her neck, lower back, and knee and unspecified foot problems. She testified that she has difficulty turning her head, and her back and knee pain are so severe that it feels like her back will "snap in two" and her knee will "pop out of place." Although she referenced her carpal tunnel surgery in her testimony, she did not identify any manipulative limitations and testified that she can lift up to 20 to 30 pounds. She can also walk for a block or more, but cannot sit longer than 45 minutes or stand more than two hours at a time.[9]

The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms, her testimony regarding their intensity, persistence, and limiting effects were not fully credible. When not substantiated by objective medical evidence, the ALJ has the discretion to make a finding on the credibility of the statements concerning the intensity, persistence or limiting effects of symptoms and the determination is entitled to considerable deference. *Foster v. Astrue*, 277 F. App'x. 462 (5th Cir. 2008); *see also Gonzales v. Astrue*, 231 F. App'x. 322 (5th Cir. 2007) (adverse credibility determination made by an ALJ was supported by inconsistencies between claimant's testimony and documentary evidence). Substantial evidence supports the ALJ's credibility findings here.

---

[9]ECF No. 13-2, pp. 26-58.

10

No medically acceptable clinical or laboratory diagnostic techniques established the existence of impairments which could be reasonably expected to produce the severity of pain that Nash alleges. As noted earlier, she was diagnosed with carpal tunnel syndrome in October 2003, but she continued to work for three years. She was subsequently released to "light duty" following her carpal tunnel release surgery in October 2006. In the consultative examination performed two years later, she was noted to be "morbidly obese," but had full range of motion in both her lower and upper extremities including her shoulders. She also had full range of motion in her back and could heel-and toe-walk without difficulty with a normal gait. Though she could only squat 30%, she had no weakness in her major muscle groups and had a 4/5 grip strength bilaterally. X-rays of her lumbar spine revealed her disc spaces were within normal limits and no fractures or dislocations. An MRI of her lower right extremity showed only mild medial joint osteoarthritis.[10]

Records from Southwest Center for Orthopedics and Sports Medicine from November 2009 also reflect that while Plaintiff complained of swelling and severe right knee pain, she rated her pain at only 5 out of 10 on the pain scale. Examiners noted that her "significant obesity" made it difficult to feel her femoral or popliteal pulses. As treatment, Plaintiff was prescribed pain medication and instructed to wear "Medi-vein stockings to treat the swelling symptomatically." Within weeks, Plaintiff reported the

---

[10]ECF No. 13-7, pp. 2- 6, 53-63, 108-13.

stockings had helped alleviate her pain. She was encouraged to continue to wear them and to elevate her feet for 15 minutes four times per day. The following month, Plaintiff was referred to Southern Bone and Joint Specialists due to continued complaints of leg pain and swelling, and radiating back pain. The treatment note reflects, however, that her hip and knee examinations were unremarkable and her straight leg raises were negative. The treating orthopedist indicated that x-rays and a MRI of her lumbar spine were somewhat difficult to interpret due to the soft tissue overlay, but as noted by the ALJ, his clinical assessment was that Plaintiff's "leg symptoms were not coming from her back," but were rather "easily explained by her massive body weight and small frame." Conservative treatment and chiropractic manipulation were recommended.[11]

The only medical provider of record to suggest the extreme limitations Plaintiff alleges was her nurse practitioner. In a medical source statement submitted in February 2010, the nurse practitioner opined that while Plaintiff remained capable of frequent gross and fine manipulations, she could not sit, stand, or walk for longer than two hours in an eight-hour workday, and could never push, pull, or climb stairs. The practitioner did not assign any strength limitations and opined that Plaintiff's impairments would cause her to miss work more than four days per month.

As a initial matter, a nurse practitioner is not an "acceptable medical source" entitled to the same weight as a licensed physician's opinion. Compare 20 C.F.R. §

---

[11]ECF No. 13-7, pp. 116-24.

416.913 (d)(1), 20 C.F.R. § § 416.927 (a)(2), (a)(3).[12] The ALJ is also free to reject any opinion, in whole or in part, when the evidence supports a contrary conclusion, when the opinions are conclusory, or when they are unsupported by medically acceptable clinical, laboratory, or diagnostic techniques. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172 (5th Cir. 1995).[13]

Here, the only limitations supported by the objective medical evidence were the manipulative limitations adopted by the ALJ. In compliance with SSR 96-2p, he provided the following as good cause for assigning reduced weight to the practitioner's other findings:

> . . . . [The medical source statement] does not explain what medical impairments are diagnosed. It contains no explanation for the extreme limitations. The better an opinion is explained, generally the more weight it is entitled to, provided the explanation is grounded on solid medical footing. The absence of medical explanation, however, does not invalidate an opinion, it just requires me to review treating notes to discover my own explanation. In reviewing the treatment notes [from the clinic], I simply cannot see diagnoses, medical findings or even complaints that suggest limitations as extreme as those contained in [the nurse practitioner's medical source statement].[14]

*See Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994). Plaintiff does not dispute the

---

[12]Acceptable medical sources include licensed physicians or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists." *Porter,* 200 F. App'x at 319 (5th Cir. 2006) (citing 20 C.F.R. § § 404.1513(a), 416.913(a)).

[13]ECF No. 13-7, pp. 127-28.

[14]ECF No. 13-2, p. 20.

13

ALJ's sound reasoning, nor does she direct the Court to any objective medical evidence supporting the extreme limitations her nurse practitioner assessed. Substantial evidence also indicates that she can perform the strength demands of light work, contrary to her arguments on appeal. The ALJ found that she can lift 10 pounds frequently and 20 pounds occasionally. This finding is supported not only by the objective medical evidence, but also by Plaintiff's own testimony that she can lift up to 20 to 30 pounds.

Conflicting evidence as to why Plaintiff stopped working at Delphi Automotive in October 2006 supports the ALJ's adverse credibility determination as well. On her application for benefits, Plaintiff reported that she stopped working to have carpal tunnel surgery, and while she was recovering, she was contacted by Delphi and "told not to return because [the] business was closing down." This contradicts the explanation given at her administrative hearing. In response to questioning by the ALJ, she testified that her impairments caused excessive medical absences and intimated that she would have been fired had she attempted to return. The ALJ reasoned as follows:

> There are inconsistences in her testimony and the other evidence that diminishes her credibility. She said, for example, that she was missing excessive amounts of work– about two or three days a month since 2003. Her earnings record does not show a reduction in pay that would suggest this degree of work absence. Additionally, she testified her absences were accompanied by excuses from Stat Care physicians, emergency room physicians and Nurse Aldridge, but these work excuses do not appear in the medical evidence. In fact, she was not even seeing Nurse Aldridge before she stopped work, according to [clinic records]. Further, the medical evidence does not contain complaints that would suggest limitations as extreme as she alleges.[15]

---

[15] ECF Nos. 13-2, pp. 20, 37-41; 13-6, p. 15.

14

Conflicts in evidence are to be resolved by the ALJ, not a reviewing court. *Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir. 2008). Substantial evidence supports the ALJ's credibility findings and they should not be disturbed here.

Based upon consideration of the evidentiary record as a whole, the ALJ determined that Plaintiff failed to establish that her impairments were of sufficient severity to be disabling. The undersigned's review of the record compels a finding that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. For these reasons, it is the opinion of the undersigned United States Magistrate Judge that Defendant's Motion to Affirm the Commissioner's Decision be granted; that Plaintiff's appeal be dismissed with prejudice; and, that Final Judgment in favor of the Commissioner be entered.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Rule 72(a)(3) of the *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi*, any party within 14 days after being served with a copy of this Report and Recommendation, may serve and file written objections. The objecting party must specifically identify the findings, conclusions, and recommendations to which he or she objects. Within 7 days of the service of the objection, the opposing party must either serve and file a response or notify the District Judge that he or she does not intend to respond to the objection.

The parties are hereby notified that failure to file timely written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636, Fed. R. Civ. P. 72(b) (as amended, effective December 1, 2009); *Douglas v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

This the 15th day of July 2013.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE